**Stuart PATRAY, Terry Patray, Plaintiffs,**

v.

**NORTHWEST PUBLISHING, INC., et al., Defendants.**

**Civil Action No. 696–52.**

United States District Court, S.D. Georgia, Statesboro Division.

June 13, 1996.

Stuart Patray, Pro Se.

Terry Patray, Pro Se.

## ORDER

EDENFIELD, Chief Judge.

Plaintiffs Stuart and Terry Patray move this Court for entry of a default judgment against defendants Northwest Publishing, Inc. ("Northwest") and various individuals. The motion is unopposed. Plaintiffs have proceeded *pro se*, requiring this Court to construe their pleadings liberally. *See, e.g., White v. Butterworth*, 70 F.3d 573, 574 (11th Cir.1995).

### I. BACKGROUND

The Patrays are Georgia citizens. Complaint ¶¶ 4–5. All of the individual defendants reside in Utah, *id.* ¶¶ 7–10, and Northwest is a Utah corporation. *Id.* ¶ 6. The Patrays alleged that defendant Jason Van Treese, acting as Northwest's Marketing Director, induced Stuart Patray to publish his "Root Of All Evil" book through Northwest. Complaint ¶¶ 8. Promising Stuart Patray $9,950 plus 15% royalty on guaranteed 2,500 book sales, *id.* ¶ 13, Van Treese convinced Stuart Patray to sign Northwest's publishing contract. *Id.* ¶¶ 7, 11–19; Exh. A. Patray was required, however, to invest $6,125 into the project. *Id.*

Van Treese thus sent the contract to Patray in Georgia, where he signed and sent it, along with his $6,125 check, back to Van Treese in Utah. Complaint ¶ 20–21 & Exh. B. Patray relied upon the promised (December 1994) publishing date because he borrowed the $6,125 from a "local financial institution," Terry Patray co-signed for that loan, *id.* ¶ 22,[1] and they had to pay interest on it. *Id.* ¶ 27.

Van Treese informed Patray that Northwest's Operations Manager (and named defendant) Jim Perkins would be Northwest's "contact person." Complaint ¶ 23. When it appeared that the book would not be completed by December, 1994, Patray sent Van Treese a 12/19/94 letter demanding his money back and release from the contract. *Id.*

---

1. Apparently this is the only involvement Terry Patray has had in this case, as the contract and communications arose solely between Northwest and Jason Van Treese on the one hand, and Stuart Patray on the other. No other facts or legal theories are raised to support Terry Patray's standing as a plaintiff in this case. Hereafter, all references to "Patray" shall be to Stuart unless otherwise noted.

¶ 33. In a January, 1995 telephone conversation, Van Treese tried to convince Patray to await a March, 1995 publication, *id.* ¶¶ 34–39, at the same time adverting to Perkins' earlier assurances that the delay was attributable to "quality control" and "normal" publication processes, *id.* ¶¶ 24, 26, 35, though publishing "variables" nevertheless permit no firm date. Van Treese informed Patray that the book would be published in thirty days. *Id.* ¶ 38.

Losing patience, Patray sent defendant James Van Treese, Northwest's publisher, *id.* ¶ 7, a 2/7/95 letter demanding a refund based on Northwest's failure to perform. *Id.* ¶ 42. Both defendants Jason and James Van Treese failed to return Patray's calls thereafter. *Id.* ¶ 43. A 3/8/95, follow-up demand letter likewise fetched no response. *Id.* ¶ 44.

Subsequently, the Patrays sued defendants[2] in State court and, in July, 1995, a defense lawyer offered them a $7,000 settlement. The Patrays accepted but never received payment, *id.* ¶¶ 46–47, so they filed this action, alleging diversity subject matter jurisdiction under 28 U.S.C. § 1332(a), *id.* ¶¶ 48–50, and personal jurisdiction under Georgia's Georgia Long Arm statute, O.C.G.A. § 9–10–91(1). *Id.* ¶ 62–77.

Patray alleged fraud and "misrepresentation and deceit." He sought to recover punitive damages based on the defendants' misrepresentations concerning the book's publication date and projected return on Patray's investment. *Id.* ¶¶ 51–61, 84–87. He also sought damages for breach of contract. *Id.* ¶ 83. More specifically, he sought $9,950 in "consequential damages" *id.* Relief Requested ¶ 1; $15,000 in compensatory damages; *id.* ¶ 2; $250,000 in punitive damages from each defendant, *id.* ¶ 3; recovery of litigation expenses under O.C.G.A. § 13–6–

11, *id.* ¶ 4; and recovery of interest under O.G.G.A. § 13–6–13. *Id.* ¶ 5.

On 4/19/96, Patray filed "Out of State Affidavits" showing 3/28/96 personal service of the Summons and Complaint upon defendants Northwest, James and Jason Van Treese, Jim Perkins and Ann Cude. Upon defendants' failure to file an Answer, Patray moved the Court for entry of default on 5/8/96. He certified that on 5/7/96 he served James Van Treese by mail with a copy of his motion, though he referenced it as "plaintiffs' Motion for entry of *Clerk's* Default Judgment" (emphasis added) when in fact he made it clear, on page 1 and in ¶ 7 of the motion, that he sought entry by this Court. No response has been filed. *See* Rule 55(b)(2) (3–day notice required); Local Rule 7.5 (15–day motion reply period).

## II. *ANALYSIS*

■ A motion for the *Court's* entry of judgment by default[3] is not granted as a matter of right, and in fact is judicially disfavored. 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Prac. & Proc.* Civil 2d §§ 2681, 2685. That is why F.R.Civ.P. 55(b)(2) vests the Court with judicial discretion in determining whether the judgment should be entered. *Id.* § 2685 at 421 (citing *Mason v. Lister*, 562 F.2d 343, 345 (5th Cir.1977)). In that regard, the commentators indicate that

> [t]he ability of the court to exercise its discretion and refuse to enter a default judgment is made effective by the two requirements in Rule 55(b)(2) that an application must be presented to the court for entry of judgment and that notice of the application must be sent to the defaulting party *if* he has appeared.

2. The final defendant is Ann Cude, a Northwest editor. Complaint ¶ 10. Her actions are not specifically assailed in the Complaint, *see id.* ¶¶ 31–32, except that her 12/5/94 (attached to the Complaint) letter to Patray explained the editing and publication process, noting that delay-causing problems are routine.

3. In contrast to the *Clerk's* "entry of default," Rule 55(a), which becomes a "fact [that] is simply noted on the docket," 6 Moore's Fed.Prac. ¶ 55.03[1] at 55–19, after which the non-appearing, defaulting party loses the right to receive

notice of future proceedings. *Id.* ¶ 55.03[2]. At that point the plaintiff can further move the Clerk to enter default judgment if the other conditions of Rule 55(b)(1) are met. *Id.;* 6 Moore's Fed.Prac. ¶ 55.04 (those conditions are that the claim must be for a sum certain, upon the failure to appear by a defendant who is neither an infant nor an incompetent). In one case a Clerk's entry of default and entry of the default judgment both occurred on the same day. *FDIC v. Spartan Mining Co.*, 96 F.R.D. 677, 679 (S.D.W.Va.1983), aff'd, 731 F.2d 1134 (4th Cir.1984).

10 *Federal Prac. & Proc.* Civil 2d § 2685 at 423 (emphasis added).

■ The appearance requirements are not strict. *See Key Bank of Maine v. Tablecloth Textile Corp.*, 74 F.3d 349, 353 (1st Cir.1996); 10 *Federal Prac. & Proc.* Civil 2d § 2686; 6 Moore's Fed.Prac. ¶ 55.05[3]. Nevertheless, no defendant has made any sort of appearance in this case. Thus, while Patray's own certification reveals that he served only defendant James Van Treese with the instant motion, and therefore notice has not been provided to the remaining defendants, nevertheless, their prior non-appearance in this case neutralizes Patray's Rule 55(b)(2) notice obligation.[4] It is in that sense that the formality of first having default "entered" on the docket for the purpose of facilitating notice is, at this point, dispensable. *See Meehan v. Snow*, 652 F.2d 274, 276 (2nd Cir.1981), discussed in 6 Moore's Fed.Prac. ¶ 55.03[1] n. 15.

■ In any event, the Court does not view these developments as inhibiting its duty to exercise discretion in doing same. 10 *Federal Prac. & Proc.* Civil 2d § 2683 at 416 ("To make certain that they occur only in appropriate cases, the courts have discretionary power to deny a motion for judgment by default, even when a technical default has occurred, and to allow the action to be tried on the merits"). The following principles guide this Court's discretion:

(1) The Court must have personal and subject-matter jurisdiction over the defendants. 10 *Federal Prac. & Proc.* Civil 2d § 2682 at 407. "The presence of the court's jurisdiction should appear on the face of the complaint." 6 Moore's Fed. Prac. ¶ 55.02[3].

(2) "Upon entry of a default judgment, the well-pleaded allegations of the complaint are to be accepted as true, except those relating to the amount of damages." *Sales v. Republic of Uganda*, 828 F.Supp. 1032, 1038 (S.D.N.Y.1993).

(3) However, "[t]he complaint must state a cause of action." 6 Moore's Fed.Prac. ¶ 55.02[3] at 55–9. In other words, "[j]udgment by default may be granted only for such relief as may lawfully be granted upon the well-pleaded facts alleged in the complaint." 6 Moore's Fed. Prac. ¶ 55.02[2] at 55–20.

(4) Furthermore, "[w]hile the well-pleaded facts alleged in the complaint are deemed admitted on entry of default, plaintiff's conclusions of law are not deemed admitted or established, and the court may grant only the relief for which a sufficient basis is asserted in the complaint." 6 Moore's Fed.Prac. ¶ 55.02[2] at 55–20 (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975) ("The defendant is not held to admit facts that are not *well pleaded* or to admit conclusions of law") (emphasis original)). In that sense "a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover." *Id.; Wahl v. McIver*, 773 F.2d 1169, 1172–73 (11th Cir.1985) (district court was correct in denying motion for default judgment against county's public defender since the plaintiff's allegations did not state a cause of action against him).

(5) "Once the court determines that a judgment by default should be entered, it will determine the amount and character of the recovery that should be awarded." 10 *Federal Prac. & Proc.* Civil 2d § 2688 (1996 Supp.).

(6) Generally, damages may be awarded without a hearing if they are for a liquidated amount, which means a "sum certain." *Id.* § 2683 at 414.

(7) However, a plaintiff "cannot satisfy the certainty amount simply by requesting a specific amount. He must also establish that the amount is reasonable under the circumstances." *Id.* § 2683 at 415; § 2684 at 418.

(8) "It is a proper exercise of judicial power for a court upon default, by taking

---

**4.** For that matter, Patray had the right to entry of default by the Clerk on non-appearance grounds, *see* Rule 55(b)(1); 10 *Federal Prac. & Proc.* Civil 2d § 2683 at 415–16; § 2686 at 430, though apparently only for the liquidated damages portion of his complaint. 6 Moore's Fed.Prac. ¶ 55.04 (claim must be for a sum certain, upon the failure to appear by a defendant who is neither an infant nor an incompetent).

evidence when necessary or by computation from facts of record, to fix the amount which the prevailing party is lawfully entitled to recover and then give judgment accordingly." *Kleier Advertising, Inc. v. John Deery Motors, Inc.*, 834 F.Supp. 311, 314 (D.Iowa 1993). The trial judge, sitting without a jury, has considerable latitude in determining the amount of the damages. *Jones v. Winnepesaukee Realty*, 990 F.2d 1, 4 (1st Cir.1993).

(9) In a default case, neither the plaintiff nor the defendant has a constitutional right to a jury trial on the issue of damages. *Matter of Dierschke*, 975 F.2d 181, 185 (5th Cir.1992).

■ In this case, some of the claims are well-pleaded, and others are not. Accepting the allegations as true, no claim is stated, and thus no basis for recovery exists, for Terry Patray, who simply co-signed Stuart Patray's loan and for whom there is otherwise alleged no contact with the defendants. Hence, no default judgment can be entered on his behalf. Under F.R.Civ.P. 21, he must be dropped as a party from this case. *Wahl*, 773 F.2d at 1172–73 (in multi-defendant case, district court was correct in denying motion for default judgment against county's public defender since the plaintiff's allegations did not state a cause of action against him).

■ Next, there is the obvious question of jurisdiction, without which any default judgment for Patray might ultimately be deemed useless should defendants contest its domestication in Utah. In that regard, Georgia courts allow Georgia residents to collaterally challenge other-state default judgments against them on personal jurisdiction grounds. *Sanwa Leasing Corp. v. Stan Hunt Construction Co, Inc.*, 214 Ga.App. 837, 449 S.E.2d 347 (1994) (vacating Michigan default judgment, predicated on contract procured by fraud, because Sanwa, which tried to domesticate the judgment under O.C.G.A. § 9–12–130, failed to show that the Michigan court had personal jurisdiction over Hunt or his company); *Signet Bank/Virginia v. Tillis*, 196 Ga.App. 433, 436, 396 S.E.2d 54 (1990) (Virginia bank sent unsolicited, pre-approved credit card application to Georgia resident who filled it out and used it, making several payments before defaulting; bank obtained Virginia judgment against him and tried to domesticate it in Georgia; trial court denied bank's summary judgment and *sua sponte* granted it to resident, determining as a matter of law that Virginia could not establish personal jurisdiction over Georgia resident; judgment upheld because Virginia established no personal jurisdiction over judgment debtor, who had insufficient contact with that State).

It is debatable whether, under the "transacting business" provision of O.C.G.A. § 9–10–91(1), personal jurisdiction exists over any of the defendants. *See Allegiant Physicians Services, Inc. v. Sturdy Memorial Hospital*, 926 F.Supp. 1106 (N.D.Ga.1996) (no personal jurisdiction where plaintiff initiated contact with nonresident defendant; all negotiations occurred in Massachusetts or by telephone and mail between that State and Georgia; no representative of defendant ventured into Georgia during negotiations; focus of the agreement was in Massachusetts; mailing of payments to Georgia, forum State, is given little weight; contract's choice of law provision selected Massachusetts law; contract specifically provided that it was delivered and executed in Massachusetts; and defendant did not accept from plaintiff any long-term and exacting regulation of its operations); *Beverage Management Solutions, Inc. v. Yankee Spirits, Inc.*, 218 Ga.App. 95, 96–98, 460 S.E.2d 564 (1995) (no personal jurisdiction over Massachusetts corporation; minimum contacts consisting of telephone calls, fax and mail communications, and sending of product data base and current inventory data into Georgia held insufficient to link corporation to the State); *Pratt & Whitney Canada v. Sanders*, 218 Ga.App. 1, 3–4, 460 S.E.2d 94 (1995); *Pleats, Inc. v. OMSA, Inc.*, 211 Ga.App. 643, 440 S.E.2d 214 (1993).

The uncontested allegations in this case show a steady, unbroken series of contacts by Jason Van Treese and Northwest, from their initial solicitation of Stuart Patray in Georgia, Complaint ¶ 11; *but see id.* ¶ 10 (plaintiff gave notice of his novel's completion "to over 200 publishing companies in the fall of 1993," which evidently triggered Van Treese's November, 1993 contact with Pa-

tray), to Van Treese's repeated follow-up telephone contacts, *id.* ¶¶ 12–118, delivery of Northwest's contract to Patray in Georgia, *id.* ¶ 12, and solicitation of Patray's $6,125 check.

These facts arguably distinguish Patray's case from *Allegiant* and related cases cited above, and place it closer to *Garrett Assoc., Inc. v. Mediplex Group, Inc.,* 209 Ga.App. 738, 434 S.E.2d 568 (1993) (personal jurisdiction established over defendant who knowingly and purposely acted to consummate a transaction within this state with respect to a contract), in that Van Treese and Northwest actively participated in dealings with Patray such that their actions were purposeful and created continuing obligations between them. 209 Ga.App. at 740, 434 S.E.2d 568. If Patray has established personal jurisdiction, however, it would, for the reasons explained *infra,* extend only to Northwest and Jason Van Treese.

Patray must also demonstrate the existence of subject-matter jurisdiction. He alleges clear diversity of citizenship allegations, Complaint ¶¶ 2–10; *Tapscott v. MS Dealer Serv. Corp.,* 77 F.3d 1353 (11th Cir. 1996) (every plaintiff must be diverse from every defendant), and points to his tort and punitive damage claims in pleading that the amount in controversy is "over $50,000." Complaint ¶¶ 48–50 & pp. 14–15.

■■■■ For purposes of the amount-in-controversy requirement, unless the law provides otherwise, a plaintiff's damage claim generally will control the amount in controversy for jurisdictional purposes if such claim is made in good faith. *Coventry Sewage Assoc. v. Dworkin Realty Co.,* 71 F.3d 1, 4–6 (1st Cir.1995). It therefore must appear to a legal certainty that the claim is really for less than the jurisdictional amount in order to justify dismissal on jurisdictional grounds. *Adkins v. Gibson,* 906 F.Supp. 345, 346 (S.D.W.Va.1995).

■■■■ Assuming *arguendo* that Patray's contract-based and "consequential damages" claims are true, that places him, even with accrued 7% prejudgment interest,[5] well below the $50,000 amount required by 28 U.S.C. § 1332(a). In that regard, the $50,000 requirement must be "rigorously enforced." *Coventry,* 71 F.3d at 5. On that point it must be further noted "that subject matter jurisdiction cannot be waived, and that courts must raise the issue *sua sponte* when it appears that subject matter jurisdiction is lacking." *Buethe v. Britt Airlines, Inc.,* 749 F.2d 1235, 1238 n. 3 (7th Cir.1984); *accord, Bzdzuich v. U.S. Drug Enforcement Administration,* 76 F.3d 738, 742 (6th Cir. 1996); *Levin v. ARDC,* 74 F.3d 763, 766 (7th Cir.1996). Thus,

> if, from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount, and that his claim was therefore [merely] colorable for the purpose of conferring jurisdiction, the suit will be dismissed.

*Coventry,* 71 F.3d at 5 (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.,* 303 U.S. 283, 288–89, 58 S.Ct. 586, 590, 82 L.Ed. 845 (1938)).

■■■■ Of course, "[e]vents occurring subsequent to the institution of the suit which reduce the amount recoverable below the statutory limit do not oust jurisdiction." *Id.* On the other hand, "if later evidence shows, to a legal certainty, that the damages never could have exceeded the jurisdictional minimum *such that* the claim was essentially feigned (colorable) in order to confer jurisdiction, the action must be dismissed." *Id.* 71 F.3d at 6 (emphasis original).

Here there were no jurisdiction-affecting events beyond the unanswered Complaint and thus the Complaint itself must support 28 U.S.C. § 1332(a)'s amount in controversy requirement. Hence, jurisdiction turns on whether Patray has stated a fraud claim, which is necessary to support his punitive damages claim, assuming those can be liquidated to an amount which, when combined

---

**5.** *See* O.G.G.A. § 13–6–13 (authorizing award of legal interest from the date of breach to the point of recovery); O.C.G.A. § 7–4–2 ("The legal rate of interest shall be 7 percent per annum simple interest where the rate percent is not established by written contract").

with the claimed contract damages, place Patray over the $50,000.00 jurisdictional minimum.

To that end, "[f]raud may not be presumed, but, being in itself subtle, slight circumstances may be sufficient to (sustain a finding) of its existence." *Douglas v. Standard,* 191 Ga.App. 640, 641, 382 S.E.2d 419 (1989). However, when fraud is so subtle as to be non-existent, summary judgment is appropriate, *id.* 191 Ga.App. at 641, 382 S.E.2d 419, in which case, were such principle applied here, it would be concluded that Patray has not stated a claim in the first place.

Patray's fraud claim fails as a matter of law. The Court preliminarily notes that fraud simply cannot consist of "broken promises, unfulfilled predictions or erroneous conjectures as to future events." *Curtis v. First National Bank,* 158 Ga.App. 379, 381, 280 S.E.2d 404 (1981) (citing *Cheney v. Barber,* 144 Ga.App. 720, 721, 242 S.E.2d 358 (1978)). Evidently recognizing that threshold, Patray has alleged, in his "First Cause of Action" allegation, that "[d]efendants knowingly and intentionally provided false information regarding a publishing date and return on plaintiffs' investment to deceive plaintiffs in order to obtain plaintiffs' funds." Complaint ¶ 51. Arguably that meets F.R.Civ.P. 9(b)'s particularity requirement.

Even assuming that Patray has sufficiently alleged fraud, nevertheless, in his thoroughness, Patray attached to his Complaint a copy of the Northwest/Patray contract and thus incorporated it through F.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes"). The contract contains a merger clause. Complaint Exh. A. ¶¶ 17, 19.

In addition, Patray is subject to Georgia's election rule. *See Rivers v. BMW of North America, Inc.,* 214 Ga.App. 880, 881, 449 S.E.2d 337 (1994) (where a buyer is induced to enter into contract for sale of goods by fraud of seller, upon discovery of fraud the buyer has an election of remedies, which include rescinding contract or affirming contract and suing for damages).

The election rule, in turn, interplays with contractual merger clauses. *Rampey v. Jay Pontiac GMC Truck, Inc.,* 211 Ga.App. 632, 633, 440 S.E.2d 52 (1993) ("Having elected only to seek damages under the contract, appellant is bound by the merger clause of the contract"); *American Demolition, Inc. v. Hapeville Hotel Limited Partnership,* 202 Ga.App. 107, 109, 413 S.E.2d 749 (1991) ("having made its election to sue under the contract, [plaintiff] is bound by the merger clause" and thus fraud claim was barred).

In other words, where a merger clause exists and purports to merge all prior representations (in this case, Van Treese's underlying representation that Northwest would, in exchange for Patray's money, manuscript and entry into the contract, publish Patray's book by December, 1994), that clause typically will bar an action for fraud. *See, e.g., Flair Fashions, Inc. v. SW CR Eisenhower Drive, Inc.,* 207 Ga.App. 78, 427 S.E.2d 56 (1993) (The merger clause in the parties' lease agreement barred Flair's fraud defense and counterclaim).

Against those cases is *Crews v. Cisco Brothers Ford–Mercury, Inc.,* 201 Ga.App. 589, 411 S.E.2d 518 (1991) (no need to tender automobiles back to defrauding contract party who still has original payment, thus giving that party unconscionable advantage of having both the cars and the payment for them; merger clause in contract therefore did not bar fraudulent inducement claim). According him the benefit of the doubt, Patray falls within the *Crews* line of cases, though he seeks both benefit-of-bargain based, contract damages *and* fraud damages—on the face of it the essence of a double recovery.

Stated differently, Patray's allegations, construed liberally, would support an argument that he should not be bound by a contract's terms where he was fraudulently induced to enter into the contract itself. *Gaines v. Crompton & Knowles Corp.,* 190 Ga.App. 863, 866, 380 S.E.2d 498 (1989) (fraud extrinsic to the contract). *Crews* reasons that it is pointless for the aggrieved plaintiff to tender rescission where the defendant would then wind up holding both the consideration and the contract benefit.

On the other hand, Patray wants it both ways—he insists on affirming the contract so he can reap the benefit of his bargain (*i.e.,* affirm it so he can be awarded his $15,000 compensatory, benefit of the bargain, profit-based damages, rather than rescind to obtain his $6,125 back); at the same time, he seeks fraud and punitive damages. The Court has located precedent upon which Patray might start to build such a claim:

A purchaser claiming to have been fraudulently induced into entering a sales contract [here, for the publication of Patray's book in exchange for his $6,125, his literary efforts, and his profit-splitting agreement] has an election of remedies involving rescission or affirmation of the contract. [Cits.] One remedy is to promptly after discovery of the fraud rescind the contract, and after offering to restore the benefits received under the contract or showing a sufficient reason for not doing so, sue in tort for recovery of the purchase price and for any additional damages resulting from the alleged fraud.

*Ben Farmer Realty Company v. Woodard,* 212 Ga.App. 74, 441 S.E.2d 421 (1994).

*Ben Farmer* therefore makes it clear that one can demand rescission, be excused from tendering anything back (as in this case, where there is nothing for Patray to tender back), and "sue in tort for recovery of the purchase price and for any additional damages resulting from the alleged fraud." *Id.* But that court also illuminated another remedy: "to **affirm** the contract and sue for damages resulting from the alleged fraud." *Id.* (emphasis added). Hence, one can either rescind and sue for fraud, or affirm and sue for fraud. In the latter case, the suit

is not a suit for the violation of the contract, but is one for a tort and involves affirmance of the contract, and [the defrauded party] may keep the fruits of the contract and maintain an action for the damages suffered by reason of the fraud. [Cit.] It can not be said that merely affirming the contract by the defrauded party will necessarily deprive him of the right to sue for damages for the fraud inducing him to make the contract, as the right to affirm the contract and the right to sue for

damages for the fraud coexist. [Cits. omitted]

*Ben Farmer,* 212 Ga.App. at 74, 441 S.E.2d 421 (first brackets original; quoting *Tuttle v. Stovall,* 134 Ga. 325, 329, 67 S.E. 806 (1910)).

In that second, "affirm-contract/fraud suit" scenario, the *Ben Farmer* court further explained that the aggrieved purchaser has, on balance, brought a

tort action[, wherein] the defrauded purchaser may seek as damages the difference in the value of the property sold to him and its value if the property had been the same as it was represented to be. [Cit.] [Thus,] [a]lthough the suit is an independent action in tort, it is based on the defrauded party's election to affirm the contract, and sue for damages resulting from the fraud arising out of the contract.

*Id.,* 212 Ga.App. at 74–75, 441 S.E.2d 421; *see also Seminole Peanut Co. v. Goodson,* 176 Ga.App. 42, 45, 335 S.E.2d 157 (1985) ("An independent action in tort based on fraud and deceit arising out of contract is not a suit for the violation of the contract but involves affirmance of the contract and the defrauded party may keep the benefits of the contract and maintain the action for damages suffered by reason of the fraud") (internal quotes and cites omitted).

This latter line of cases does not support a double recovery scenario. Rather, one can either rescind the contract and sue for both the purchase price (*e.g.,* in the defrauded automobile purchaser context, what the plaintiff paid for the car) and "fraud" (*e.g.* punitive) damages, or affirm the contract (as in the defrauded car purchaser example) and sue for the value of what was promised (*e.g.,* the dollar value a car represented to have only 20,000 miles on it instead of 80,000) plus "fraud" (typically involving general and punitive damages).

This is, essentially, what Patray has alleged. He does not seek rescission and his $6,125 "investment" back, but instead wants the value of that which was promised to him (*i.e.,* the projected $15,000 profits had the book been published as promised) *plus* "damages resulting from the fraud arising out of the contract." *See* Complaint ¶¶ 53 (seeking

punitive damages "recoverable under Georgia law in breach of contract if fraud is present").

The price for taking this approach, however, is that legally Patray has "elected to affirm the contract, [in which case] the defrauded party is bound by its terms and is subject to any defenses which may be asserted by the other party based on the terms of the contract." *Ben Farmer,* 212 Ga.App. at 75, 441 S.E.2d 421. That, in turn, subjects Patray to the merger clause, just as it did plaintiff Woodward in *Ben Farmer.* 212 Ga. App. at 77, 441 S.E.2d 421.

It is true that defendants are in default and thus have waived all defenses and deemed all factual (except the amount of damages) allegations to be true. Thus, just as in the case where a defendant files an Answer but fails to raise an affirmative defense, defendants are deemed to have waived same. *See* F.R.Civ.P. 8(c). In the default context, that includes most procedural defenses. *See, e.g., Sanderford v. Prudential Ins. Co. of America,* 902 F.2d 897, 900 (11th Cir.1990) (failure to raise defense of insufficiency of service of process before entry of a default judgment results in waiver of that defense).

However, the Court could find no legal precedent which authorizes Patray, in the circumstances of this case, to selectively be bound by (and thus recover for breach of) a portion of the contract while at the same time ignore another. The merger clause is no more and no less a part of the contract than Northwest's promise to publish and pay Patray the profit he now demands in affirming same. The merger clause prevented Woodward from recovering on an affirm-contract/fraud theory in *Ben Farmer,* and so it must do likewise here.

With no viable fraud or other tort claims, then, Patray's punitive damages claim against Jason Van Treese and Northwest also must fail. *Compare Wal–Mart Stores, Inc v. Forkner,* 221 Ga.App. 209, 471 S.E.2d 30 (1996) (awarding punitive damages, in default, to plaintiff who recovered only on tort claims).

Patray's claims against the remaining defendants are problematic at best. Indeed, whether they can be said, for personal jurisdiction purposes, to have minimum contacts with this State, is bound up in the overarching question whether, accepting the allegations as true, Patray has even stated any claims against them. The pleadings suggest nothing more than the fact that Jim Perkins and Ann Cude were doing their jobs.

There is no allegation, for example, that they knowingly lied to or misled Patray, or that, while employed by Northwest, they knew Jason Van Treese and Northwest combined to defraud Patray by falsely promising publication in exchange for Patray's money and manuscript. And James Van Treese's only involvement in this case is his failure to respond to the demand letters and telephone calls Patray directed to him. Complaint ¶¶ 42–44.

None of these facts are sufficient to state contract or fraud-based claims against these defendants, much less hale them into Georgia courts for suit, even if Patray's fraud claim were viable and coupled with conspiracy allegations (he pleaded none). *See Metzler v. Love,* 207 Ga.App. 447, 449, 428 S.E.2d 384 (1993) (citing *Coopers & Lybrand v. Cocklereece,* 157 Ga.App. 240, 246, 276 S.E.2d 845 (1981) (an allegation that a nonresident, who personally has conducted no activity in Georgia or with a Georgia co-conspirator who committed tortious acts in Georgia and through the conspiracy is chargeable with the acts of the co-conspirator within this state, does not establish a "contact" with Georgia in the absence of evidence of purposeful activity within Georgia by that nonresident)).

Accordingly, were judgment to be entered at all, it would be only on behalf of Stuart Patray against defendants Jason Van Treese and Northwest for contract damages. *Wahl,* 773 F.2d at 1172–73; *Pinaud v. County of Suffolk,* 52 F.3d 1139, 1152 n. 11 (2nd Cir. 1995). But judgment cannot be entered be-

cause there is no subject matter jurisdiction, thus requiring dismissal of this case outright.

In other words, on the face of the Complaint, Patray's claims cannot be said to approach anywhere close to the "over $50,000" amount required by 28 U.S.C. § 1332(a). In that this Court must "diligently enforce" Congress' intent on this aspect of subject matter jurisdiction, *Coventry,* 71 F.3d at 6, it likewise is required to dismiss this entire case on jurisdictional grounds under F.R.Civ.P. 12(h)(3).

This Court agrees with the First Circuit, however, that both Patrays are entitled to notice and an opportunity to be heard before their case is dismissed. *Quirindongo Pacheco v. Rolon Morales,* 953 F.2d 15, 16 (1st Cir.1992).

## III. *CONCLUSION*

If this Court had subject matter jurisdiction, plaintiff Stuart Patray would be entitled to a Final Judgment only against defendants Jason Van Treese and Northwest Publishing, Inc., and only on his contract-based claims. Plaintiff Terry Patray, as well as all other defendants, would dropped from this action pursuant to F.R.Civ.P. 21. For the reasons stated above, however, plaintiffs have failed to satisfy the amount-in-controversy requirement of 28 U.S.C. § 1332(a).

Accordingly, no subject matter jurisdiction exists, so this case is ripe for dismissal without prejudice on those grounds. However, plaintiffs Stuart and Terry Patray are entitled to predismissal notice. The Patrays therefore shall have fifteen days following the date that this Order is served upon them to show this Court why their case should not be dismissed for the reasons stated in this Order.

**SO ORDERED.**